Council to the Town of Grafton and appear before you today on behalf of the petitioners. This case involves the application of an extraordinary statutory scheme. What is extraordinary is that, unlike other federal preemption statutes, which replace state and local regulation with federal regulation, this statute replaces state and local regulation with nothing, leaving a gaping void where laws protecting health, safety, and the environment used to be. This case illustrates the tragic consequences to real people when the STB reads its jurisdictional provisions so broadly that it greenlights a massive industrial propane facility in the middle of a small town neighborhood. But the problem is that you didn't raise these interesting arguments before the board, right? No, your honor. The legal issue all along is whether the act in this case preempts the state and local regulations at issue. At that level of generality, that's true. But I don't think you argued before the board that the regulation here fits within the normal state police power and doesn't get preempted because it relates to health and safety, correct? No, that is not correct. Those issues were in front of the board for the entire duration, and the record certainly bears that out. Where do I find in the record that you raised those arguments? In all of the pleadings, the town argued that these local regulations survived. I'm sorry? Show me one where you raised these arguments about the scope of preemption as opposed to the ownership issue. All of these citations are included in our brief. And I think it's important to understand the fact that this is a legal issue subject to plenary review by this court, and the issue has always been whether the regulations were preempted. Do I take your answer to mean that you cannot identify for Judge Dyke any reference to where this was raised before the board? No, I can, Your Honor. But if I could do that, if I could provide those citations for you on rebuttal, I would appreciate it. That would be fine. They are in my brief. Just stated differently, the issue has always been what is the scope of preemption here, and does it cover these regulations? That has always been the issue. So as I was saying, the case illustrates the consequences when the STB reads its jurisdictional provisions so broadly that it greenlights a facility like this. And at the same time, it reads NEPA's environmental review provisions so narrowly that while it wholly preempts all state and local… The NEPA issue wasn't raised at all, right? The NEPA issue could not be raised because… It was not raised, right? Right. It was not raised because the agency made the determination that there was going to be no impact to the human environment as part of its decision. That cursory single sentence that it claims is its standard sentence that it puts at the end of all decisions, not making it correct, that this will not have an impact on the environment. That was the finding. And it was not until that point under the Buzzards Bay case that the NEPA harm occurred that the town could appeal that determination. That's very clear under Buzzards Bay and other NEPA cases. I can turn to the NEPA argument. This is an extraordinary preemption statute, again, that wholly displaces state environmental law and regulation and replaces it with no regulation whatsoever. That is why it is crucial in this case that the agency doesn't completely shirk any duty at all to look at the actual harm, environmental harm this is going to do. This facility is surrounded by homes. It's on top of the town's aquifer. It is bordered by a brook and a lake. There is water and groundwater all around this. Despite the town bringing that to the attention of the STB over and over and over again, the STB required absolutely no environmental review at the same time that it is completely precluding the town and the state. What does the record show about the dangers to the aquifer, about the construction of this facility? Actually, your honor, under STB law and regulations, it is up to the STB and the applicant to provide That's not my question. What does the record show about the dangers to the aquifer? The record shows that the facility is going to be constructed on the aquifer in a zone 2 area and that the water supply protection overlay district bylaw is put there for the purpose of protecting those areas, including this one, where surface contaminants trickle down and become a part of the drinking water. That is what the record shows. What was the nature of that evidence? Did you submit a declaration about that? What's the evidence? The evidence is the water supply protection overlay district bylaw and the evidence that this But did somebody testify or submit a declaration about the dangers to the aquifer? Was there something like that in the record here? No, the site was undisputed at all times that the site is located in the water supply protection overlay district. And under the STB laws and regulation, it is up to the agency to require the applicant to address environmental issues. But is the answer to the question that there is no evidence on this point, that the only thing we can look to in the record is the town's bylaw and the maps? Yes, the town did not submit any environmental experts' evidence on this issue. The town merely pointed out that there were several sensitive environmental receptors and that gives the agency the burden to look into it. That's what NEPA is there for. It's a procedural safeguard to ensure that the agency is going to look into. And at the end of the day, the agency is free to say that the potential harm to the environment is outweighed by the transportation interest here. But NEPA's purpose is to make sure that that is looked at. Under NEPA's requirements – Excuse me. Before you get to that, what triggers NEPA in this case? I thought NEPA could only be triggered by licensing and permitting decisions or major actions by federal agencies. It's the agency's statement here for the first – I understand what their statement is, but that doesn't – that can't trigger NEPA. In other words, if you read the statute, read NEPA, NEPA applies to certain types of federal actions. Licensing determinations, what the statute defines as major actions, which major federal actions, permitting decisions. This doesn't seem to come within any of those categories. There are no federal funds involved in this project. I understand the question, Your Honor. There are two things. The major federal action is the requirement of NEPA. The part about whether or not it is – well, let me stick with the major federal action. We don't know if this project could qualify as a major federal action, since under the agency's own regulation, part of the determination of whether it's a major federal action is whether the action has the potential to significantly affect the quality of the human environment. Significantly, as used in NEPA, requires consideration of both context and intensity. Context means the significance of an action must be analyzed at the locality, at the level of the locality. For instance, this is in the NEPA regs. In the case of a site-specific action, significance would usually depend on the effects in the locality. I understand the NEPA regs. What I don't understand is what makes NEPA applicable. What makes NEPA applicable is that the agency has to determine whether or not this could qualify as a major federal action. You say that, but why? That is true if the agency was doing something itself or if it was granting federal funds for something to be done. The agency is saying that it didn't engage in regulation, but it was only providing guidance. That's what you're referring to. Well, this is a declaratory action, and if the result of the declaratory action is some type of permitting or licensing or opening the federal coffers for the provision of funds, then there's a good argument that NEPA applies. But from where I sit right now, perhaps I'll address this question, I certainly will address it, counsel for the government, I think this boilerplate statement in the decision of the board is meaningless. I think it's complete dicta. I think the board is deciding an issue that's not before it and that at this point in the proceedings it has no jurisdiction to decide. Now, you want to engage on the issue, and I'm trying to find out what makes this an issue. Okay. Your Honor, the board is saying that it's not engaging in regulation but only providing guidance on the scope of federal preemption, but that's a distinction without a difference because it's undisputed that the result of the agency's action will be the extremely close proximity to the town's aquifer and other sensitive environmental receptors. What cases suggest that that kind of indirect effect brings it within NEPA? There are cases under courts have recognized that nonfederal activity that's been enabled by federal action, as is the case here, is routinely regarded as federal action. There's a long line of cases that begin with the Scientist Institute for Public Information, which is cited in our brief. That's a 1973 case. So there are plenty of times that courts have recognized that the agency action is so significant that, as is here, this facility couldn't be constructed without the agency's determination here. So at the same time that it reads its jurisdictional provisions so broadly to throw out all state and local regulation, it also states that it's going to take absolutely no look at the environmental harm that this facility could visit upon the environment and the people who live right in that area. So the industrial scale trucking operation on these tiny roads surrounded by houses and schools and children, tiny windy sloping roads, the presence, the undisputed presence of the aquifer, the lake, the brook, and this agency in a boilerplate statement just says it's not going to have any impact on the human environment. That is when the harm, the NEPA harm occurred, and the case law is very clear that that is the point at which the town could bring a NEPA claim against, and not before. It is the burden of the agency to ascertain what its NEPA obligations are, and it didn't do that in this case. What does the term categorical exclusion mean? Okay, so the categorical exclusion, there are three things. Under NEPA, an agency must prepare an environmental impact statement, an environmental assessment, or find that it falls in a categorical exclusion. No other options exist. They didn't even say in the decision that it fell within a categorical exclusion. But they stated something that amounts to that. But they have an ad hoc justification in their briefs which has been stated by the courts that that's not sufficient, that they're relying on a categorical exclusion, that declaratory orders don't require any NEPA. However, that same regulation states that for actions that generally require no environmental documentation, the board may decide that a particular action has the potential for significant environmental impacts, and that therefore the applicant, which would be the railroad, should provide an environmental report. And that is what the STB should have done based upon the presence of its sensitive environmental receptors. And I'll sit down to retain my two minutes for rebuttal. Thank you. Thank you. Mr. Vance, whom do you represent? I'm here today representing the respondents to the Surface Transportation Board in the United States of America. Okay. You might start by helping me with this term, categorical exclusion. Sure. Well, the board's regulations, as counsel for the town noted, specify that for declaratory orders no environmental documentation is typically prepared. And that's in compliance with the Council for Environmental, the CEQ regulations, which specifically allow for categorical exclusions for agency actions that typically do not qualify for NEPA review, whether because they're not major federal actions or because they don't have the potential for significant harm to the environment. And that's determined by your client? Yes, yes. The Surface Transportation Board has regulations in place that specify that for declaratory orders, like the one at issue here, no environmental documentation is normally prepared. When you say normally, what does that normally mean? Well, the regulations allow for the possibility that for certain types of declaratory orders, not preemption. I mean, the language of the regulation doesn't specify one way or the other, but declaratory orders other than preemption decisions theoretically could, in certain circumstances, raise certain environmental issues that the board would find. Where there's an authorization decision. Excuse me? Where there's an authorization decision. Well, yes. Where there's an authorization decision, that would not be a declaratory order proceeding.  But the board, you say, has the benefit of this categorical exclusion. Then why on earth does the board make what purports to be a NEPA finding when it has relied on the fact that it's not going to look at the environmental concerns? You're right. As you mentioned earlier, that statement in this decision is completely meaningless. We've been told in the briefs that this is boilerplate, that the board puts it in all the decisions. Yes, that's correct. How do we get word back to the board? Can you carry that for us to stop it? Yes, I certainly can. Because all that it does, and I don't mean to make a bad point in an environmentally sensitive area, but all that it does is muddy the waters. All right? I agree. As far as I'm concerned, it has no legal force at all. I agree, particularly because in here, it's absolutely clear that NEPA does not apply. There was no major federal action to which the obligation could attach, both because the board did not exercise any sort of regulatory authority, nor could it have, because ancillary facilities like the transload facility at issue here is not subject to board licensing, even though it is subject to the board's exclusive jurisdiction. Let me use that to bring you back to the preemption question. Yes. And put aside the waiver issue for the moment. As I understand it, there are two types of regulation that are involved here. Under state law, there's a permit required to build this facility. And I think you're probably right that under the cases in the various courts of appeals, that sort of thing, it's preempted, a permitting requirement. But there's also the municipal regulation here, which says you can't build this kind of facility on top of an aquifer because of the safety concerns. That kind of regulation is not much addressed in the cases. I'm wondering whether the scope of the statute's preemption extends to a safety regulation, which does not involve permitting, in a situation in which the board itself has no authority to consider the safety considerations as part of its preemption decision or as part of its regulatory activity. So there's a problem here. I mean, nobody can regulate the placement of the storage tanks based on safety considerations. That just seems kind of unlikely, frankly. What's your comment on that? There are a number of points that you make there, Judge Dyke, to address the issue of the existence of the regulatory gap. I mean, this was something that Congress specifically intended by — Specifically intended with respect to safety regulations? I don't think so. Well, it was specifically intended that for ancillary facilities, such as this transload facility, that the board was given exclusive jurisdiction, but then its licensing authority was specifically withdrawn. So basically to leave the decision about siting a location completely up to the road. But there's nothing in the legislative history that says that safety considerations don't remain a legitimate state and local concern, right? Well, and that is why a number of state and local types of regulation — Fire codes and things like that. But why doesn't this — why doesn't telling somebody you can't build a propane storage facility on top of an aquifer fall into the safety category? Well, because the thrust of ICDA preemption is whether a state or local regulation has the effect of managing or governing rail transportation. And, you know, the type of regulation that's at issue here, zoning regulations, absolutely prohibit railroads from conducting operations and constructing facilities. And I would point this court to the Fifth Circuit's decision — Well, suppose the regulation said you can't build a propane storage facility within so many feet of a school. And you're saying that that would be preempted too? If it amounted to an absolute prohibition on a railroad constructing a facility, then yes. And with regards to, you know, public health and safety exceptions, you know, I would point this court to the Fifth Circuit's 2012 decision in the city of Midlothian, which specifically dealt with zoning — local zoning regulations, which would have functioned to absolutely prohibit the transload facility. And the Fifth Circuit said public health and safety exceptions don't exist because of the fact that it would absolutely prohibit the construction and operation of the transload facility. Well, sometimes there's no other way to deal with a safety problem other than to say, this is going to create an unnecessary risk and you can't do it. Right. But, you know, the board precedent and court of appeals precedent and other circuits are absolutely clear that zoning regulations fall within the per se categorical preemption category. Well, I'm not sure that there are very many cases dealing with zoning regulations that are based on safety considerations. I mean, almost all of them are. I mean, almost all zoning regulations have some health and safety component to them. Environmental regulations, you know, I would point this court to the Ninth Circuit decision in the city of Auburn, the Second Circuit decision in Green Mountain, the Fourth Circuit decision in the city of Alexandria. All of these had to do with zoning regulations and the categorical exclusion — the categorical preemption of such state and local regulation. What is the municipality to do? Suppose they had put in evidence that if you had a propane storage facility, they'd necessarily leak, the stuff necessarily gets into the aquifer, necessarily makes the water undrinkable. You're saying there's absolutely nothing that either the Surface Transportation Board or the municipality can do about that, right? Well, that's not entirely true, Your Honor, because as the Surface Transportation Board and courts of appeals have held, I mean, ICTA is supposed to be read in par and materia with other federal statutes. So the Clean Water Act, the Clean Air Act, the Clean Drinking Water Act, all these federal statutes still apply. You know, the state still has authority to regulate this facility a lot. And as the petitioners specifically concede, aside from the above-ground storage tank permit requirement, the state fire safety code still applies. And that would apply to, you know, the state fire safety code regulations on installation, maintenance, the type of storage tank that is used. I mean, all of these safety codes of the state are still in place, and the board's decision makes that clear. What would the Clean Water Act do here? I'm not a Clean Water Act expert, but the Clean Water Act, whatever role the localities are allowed under the Clean Water Act, they could still pursue those remedies here. Because the Clean Water, as a number of federal court decisions make clear. You're saying the Clean Water Act authorizes local action which would otherwise be preempted by the Interstate Commerce Act? And one of the reasons that is is because it would be applying a federal standard. And the primary thrust of ICTA preemption is the exclusivity of a national standard. ICTA's twin goals were deregulation generally and the creation of a national standard. And that's why federal statutes generally are not considered to be preempted by ICTA. What's the board's role with respect to safety and environmental concerns? Assume that this issue had been properly raised. Would that have been a legitimate basis for the board precluding the transloading operation if it believed that the environment would be unjustifiably endangered? If the board has regulatory authority over transaction or construction, which it's not here, then it would be empowered to take into consideration environmental concerns to inform its decision about whether to authorize the construction. But they don't do that here. Right, they don't do that here. So in this instance, the board has no discretion whatsoever to consider environmental factors, which is one of the reasons why NEPA doesn't apply. That's why the concern about the regulatory gap. The board can't do it, and you're saying the municipality can't do it, and so nobody can do it. And it just seems kind of unlikely that Congress would write a preemption provision that would say that traditional concerns about health and safety can't be addressed by anybody. Well, that might be the case, Your Honor. But the fact is that various board decisions and various federal court decisions have recognized that the statutory scheme that Congress adopted specifically necessitates this regulatory gap. And in instances where Congress has decided that that regulatory gap is not appropriate, it has taken steps to remedy that, like in 2008 with the Clean Railroads Act, where Congress specifically took solid waste transfer facilities out of the category that it would normally have been in via this ancillary facility exception and specifically allowed states and localities and the federal government to regulate it. So Congress knows how to fix this regulatory gap problem when it wants to, and it did specifically with regard to solid waste transfer facilities. And the fact that it did not generally change the provision, the 10906 licensing exception, demonstrates that Congress specifically intended this to exist and to leave the decision about these facilities to the railroads. Unless there are other questions. Thank you. Thank you. Maverickos, good morning. Good morning, Your Honor. May it please the Court, John Maverickos for the Intervenor, Grafton and Upton Railroad Company. Your Honor, the issue before the Surface Transportation Board in this case was a very narrow one. The issue was, did the proposed transloading facility fall within the STB's exclusive jurisdiction? And in order to answer that question, the STB had to look at two specific issues. Was this transportation and was it performed by a rail carrier or under the auspices of a rail carrier? I think the town conceded that this was transportation in the form of transloading. And with regard to the rail carrier, there's no doubt that the Grafton and Upton Railroad has been a common rail carrier since 1873 in continuous operation. Therefore, under those facts, the only conclusion the STB could reach is that this constituted transportation by a rail carrier. And the standard of review of this Court of that decision is the arbitrary and capricious standard. As to the scope of preemption, even assuming that wasn't waived, the standard there, we believe, should be accorded deference in accordance with this Circuit's decision in dicta comment in the Berkshire Railway case. And it's, I'm sorry, in Bangor and Aroostock. And then its decision concerning the deference given to the STB's interpretation of its regulations in Berkshire Railway. Every circuit that has reviewed preemption and preclearance regulations of state and local governments has determined that where those regulations, by their nature, can be used to deny the railroads right to operate, they're preempted. I'd like to address briefly the questions from the Court regarding the regulatory gap. I think it's somewhat a misnomer. As my brother has said, Congress has filled the gap where it's appropriate. But I would also point out that this particular facility is regulated by numerous regulatory authorities. Federal Railway Administration has significant regulations concerning the safety of operations and rigorously enforces those. OSHA has guidelines concerning the construction and operation and the anticipation of hazards. Who regulates the impact on the aquifer? EPA has regulations. And we are required to prepare a risk management plan that addresses the effect on the environment and how those effects will be addressed by the railroad. Department of Homeland Security addresses, has security regulations that we follow. And the railroad has made every effort to try and comply with those regulations. Unless the Court has other questions, we'd ask that the petition for review be denied. Thank you. As my brother stated, the only issue in front of the agency in this case was whether this facility was going to be owned or controlled by a railroad. You were going to come back to us and rebuttal with some specific instances of where you raised this point about the municipal regulations below. Yes. So the issue is whether or not it was going to be owned and controlled by the railroad. The town continually argued that the railroad had the burden to show that it would own and control it, which is You raised that question, but the question that we were asking related to the safety aspect and the relationship between safety regulation and preemption. Where did you raise that? We raised the issue between environmental regulation. The fact that this was an environmental regulation and the fact that it was in the sensitive environmental receptors, that was not disputed. That was not a fact that the agency even found. Your Honor. But you told us at the start of your argument, or you made the argument in your brief, that because these regulations, some of these regulations affect the environment, they are outside the scope of the statutory preemption that normally applies to local regulations, right? And we asked you to tell us where you made that argument before the board, because I at least hadn't been able to find it. Okay, Your Honor. And you said when you came back in rebuttal, you'd give us chapter and verse as to where you made that argument before the board. All of the citations to the arguments that I made below in response to the waiver arguments are set forth in the brief starting at page two. I want to say that it is beyond dispute that the bounds of preemption must be determined with reference to congressional intent. And when it enacted the ICCTA in 1995, Congress set forth 15 separate policy provisions describing in detail its objectives. Not one single one of those policy provisions reveals any intent to eviscerate state and local land use and environmental regulations. Not one single one of those policy provisions reveals even a tangential motivation to completely upset the longstanding recognition of state and local police powers with respect to health and safety in the environment. Despite the complete nonexistence of any stated intent to preempt these laws, this agency has repeatedly justified its sweeping preemption of those laws on the act's supposed intention to prevent a patchwork of local regulation. If you look at the legislative history, it is clear that these are not the kinds of laws that this act intended to preempt. This agency decision is fatally flawed in several respects. They put the burden on the wrong party. They repeatedly put the burden on the town to disprove the intention of the railroad owner. He put forth nothing but his own bald assertions that he was going to operate this facility in the middle of a neighborhood on top of the aquifer in conformance with the provisions of the ICCTA. Nothing but his claim that he would do that. On this record, given his credibility problems, that simply cannot be sustained. The STB also didn't require the correct quantum of evidence. They referred to the substantial evidence test, which is an appellate test. The evidence provided by the proponent of preemption, which had the burden and the STB has acknowledged that he should carry the burden, was completely inadequate to support a finding that this facility will be owned and controlled by the railroad. I believe you've exceeded your time. Thank you, Your Honor. Thank you.